**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

**NELLIE A. BALDRIDGE[1]**                                             **PLAINTIFF**

**v.**                              **NO. 3:20-cv-00161 PSH**

**KILOLO KIJAKAZI, Acting Commissioner**                      **DEFENDANT**
**of the Social Security Administration**

## MEMORANDUM OPINION AND ORDER

Plaintiff Nellie A. Baldridge ("Baldridge") challenges the denial of her

application for disability insurance benefits and does so on two grounds.

Baldridge maintains that the ALJ failed to comply with a prior remand order

and failed to properly assess Baldridge's residual functional capacity

("RFC").[2] Because the ALJ's findings are supported by substantial evidence

---

[1]     In Baldridge's pleadings, she at times uses the last name "Baldridge" and at other times uses the last name "Baldridge-Mayer." It is not clear which last name she prefers. Because she uses "Baldridge" in the caption of her complaint and in the caption of her brief, the Court will use "Baldridge" throughout this Memorandum Opinion and Order.

[2]     The question for the Court is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019).

on the record as a whole, and he committed no legal error, this case is dismissed.

Baldridge filed her application for disability insurance benefits on May 13, 2013. For the next eight years, her application snaked through the administrative process and gave rise to a remand in <u>Baldridge-Mayer v. Berryhill</u>, No. 1:18-cv-00063-PSH, 2019 WL 3776811 (E.D.Ark. 2019) ("1:18-cv-00063").[3] Her application is now back for judicial review.

The issue in this case centers upon the extent to which Baldridge's migraine headaches impacted her residual functional capacity between April 1, 2012, <u>i.e.</u>, the alleged onset date, and March 31, 2016, <u>i.e.</u>, the date she was last insured. She has complained of headaches for years and has sought repeated medical attention for them.

For instance, Baldridge saw Dr. William Waldrip, M.D., ("Waldrip") on April 5, 2012, for complaints of blurred vision. <u>See</u> Transcript at 715-

---

[3]     The record reflects that the ALJ denied Baldridge's application on March 16, 2015. <u>See</u> Transcript at 199-209. The Appeals Council vacated the ALJ's decision on July 22, 2016, and remanded the case for additional consideration. <u>See</u> Transcript at 221-223. On April 28, 2017, the ALJ granted in part and denied in part Baldridge's application. <u>See</u> Transcript at 230-239. The Appeals Council vacated the ALJ's decision on September 11, 2017, and remanded the case for a second time. <u>See</u> Transcript at 247-251. On February 26, 2018, the ALJ denied Baldridge's application. <u>See</u> Transcript at 9-21. The Appeals Council denied a request for review on June 29, 2018. <u>See</u> Transcript at 1-5. Baldridge then sought judicial review by filing 1:18-cv-00063. On August 9, 2019, the Court remanded 1:18-cv-00063 for additional consideration. On March 3, 2020, the ALJ denied Baldridge's application for a third time. <u>See</u> Transcript at 898-909. Baldridge sought judicial review by filing the case at bar.

717. Waldrip ordered an MRI of Baldridge's brain, the results of which were unremarkable. See Transcript at 724.

Baldridge saw Waldrip again on April 12, 2012. See Transcript at 712-713. They discussed the possibility that her blurred vision was a manifestation of her migraine headaches, but no conclusion was reached.

Baldridge saw Waldrip next on April 18, 2012. In recording her history of present illness, he noted the following:

> ... She tells me she is having about 10-15 headaches a month. These are the same type of headache she has always had, accompanied by nausea (and sometimes vomiting), photophobia and phonophobia. No other neurological symptoms are reported. She has been tried on numerous prophylactic medications in the past without success, including Topamax. She doesn't remember having tried Depakote, however. ...

See Transcript at 709. He prescribed Depakote for her migraine headaches.

On April 23, 2012, Baldridge established care with Dr. Tommy Taylor, M.D. ("Taylor"). See Transcript at 733-735. Although Baldridge sought care primarily for blurred vision, she reported that she was having migraine headaches. Taylor noted that the results of testing were negative, and a physical examination was unremarkable. He continued her on Zomig.

Baldridge saw Taylor again on April 26, 2012, and May 8, 2012. See Transcript at 729-730, 726-728. The progress notes reflect that Baldridge's

active problems included migraine headaches, but Taylor made no findings as to the frequency or severity of the headaches.

Baldridge continued to seek medical attention for her blurred vision throughout 2012. See Transcript at 721, 761, 719, 744-746, 759, 718. In the opinion of Dr. Robert Berry, M.D., ("Berry") Baldridge's vision problems were likely caused by "some corneal molding of both eyes from enlarged and inflamed meibomian glands." See Transcript at 759.

On July 18, 2013, Dr. Ralph Mann, M.D., ("Mann") performed a consultative physical examination of Baldridge. See Transcript at 767-772. Baldridge reported, inter alia, poor vision and approximately fifteen to twenty migraine headaches a month. Mann diagnosed a history of migraine headaches, but the only work-related limitation he identified was a moderate limitation of "carry, finger, [and] handle." See Transcript at 771.

Baldridge saw Waldrip again on August 5, 2013. See Transcript at 875-877. Although Baldridge was experiencing intermittent headaches, Waldrip offered no insight into the severity of the headaches.

On August 29, 2013, Baldridge saw Dr. Beata Majewski, M.D., ("Majewski"). See Transcript at 784-794. Baldridge's history of migraine headaches were noted. As a part of Majewski's notes, he opined the following: "[Baldridge] has a cluster of depression, migraine headaches,

4

and sleeplessness and unfortunately is intolerant to medications. ..." <u>See</u> Transcript at 786. A physical examination was unremarkable.

On September 9, 2013, Baldridge was seen by Dr. Garrett Sanford, M.D., ("Sanford"). <u>See</u> Transcript at 802-804. Sanford noted that Baldridge had been keeping a daily log of her symptoms and had recorded sixteen migraine headaches in August of 2013. He diagnosed, <u>inter alia</u>, migraine headaches. A physical examination was unremarkable.

On October 1, 2013, Baldridge saw Dr. Thomas Kovaleski, M.D., ("Kovaleski"). <u>See</u> Transcript at 820-821. Baldridge reported having had migraine headaches her entire life and having approximately twenty such headaches a month. Kovaleski made no significant findings but did note that Baldridge had multiple drug intolerances.

Baldridge saw Kovaleski again on November 5, 2013. <u>See</u> Transcript at 818-819. Baldridge continued to complain of migraine headaches. Kovaleski recommended, in part, a neurological consultation and observed that "[Baldridge] is going to be a very difficult lady to have any significant impact." <u>See</u> Transcript at 818.

Baldridge saw Taylor again on April 15, 2014. <u>See</u> Transcript at 826-827, 829-831. Baldridge continued to complain of severe migraine headaches and reported that she was experiencing between fifteen to

twenty a month. Taylor continued to assess migraine headaches and prescribe Zomig.

On May 6, 2015, Taylor signed a To Whom It May Concern letter on behalf of Baldridge. <u>See</u> Transcript at 844. In the letter, Taylor represented that Baldrige suffers from debilitating migraines that occur up to twenty times a month. It was his opinion that she also had a "low tolerance for medication." <u>See</u> Transcript at 844.

Baldridge appears to have seen Taylor on three occasions between May 6, 2015, and November 10, 2015. <u>See</u> Transcript at 859-860, 860-862, 862-863. Baldridge continued to complain of migraine headaches, which she reported having in excess of twenty times a month. She reported that Zomig was only partially effective in controlling her headaches. Her physical examinations were largely unremarkable.

On May 6, 2016, or approximately two months after Baldridge was last insured, Taylor signed another To Whom It May Concern letter on behalf of Baldridge. <u>See</u> Transcript at 846. In the letter, Taylor represented that Baldridge suffers from chronic, debilitating migraine headaches. He specifically represented that she experiences "up to [twenty] migraines or more per month," headaches that cause "debilitating symptoms such as vomiting." <u>See</u> Transcript at 846. He additionally represented that she has

6

a "low tolerance for medication to help with her symptoms." <u>See</u> Transcript at 846.

On March 2, 2017, or approximately one year after Baldridge was last insured, Taylor signed a residual functional capacity form on behalf of Baldridge. <u>See</u> Transcript at 847-852. In it, Taylor offered the following opinions about Baldridge's migraine headaches, the medical testing and clinical findings to support his opinions, and the manner in which her headaches were being treated:

> Please describe the patient's symptoms as completely as possible:
>
> [Baldridge] reports about [twenty] migraines per month with associated nausea and visual disturbance. Headaches last from hours to days and only relieved by sleep.
>
> Please state all clinical findings and any medical test results and/or laboratory results:
>
> Multiple specialist visits and medications that have not had any alleviating effects.
>
> What is your diagnosis of the patient's symptoms and test results?
>
> Chronic migraines, fibromyalgia.
>
> Please describe any treatment done so far and the results of treatment:
>
> Depakote, Zomig.

What is your prognosis for this patient?

Unlikely to improve from baseline.

See Transcript at 847-848. Taylor opined that Baldridge's impairments prevent her from standing for six to eight hours, prevent her from sitting upright for six to eight hours, and require her to lie down during the day. He opined that the length of time she can stand or sit at one time varies and depends on when her migraine headaches occur. He did not believe she is capable of continuing, or resuming work at, her current or previous employment.

On May 18, 2017, or approximately fourteen months after Baldridge was last insured, Taylor signed a headache questionnaire on behalf of Baldridge. See Transcript at 891-892. In it, Taylor represented that Baldridge experiences about five migraine headaches a week, and the headaches last approximately one to three days. The headaches are triggered, in part, by strong odors. When prompted to detail the positive test results and objective signs of her headaches, he offered the following: weight loss, tenderness, impaired sleep, impaired appetite or gastritis, 1995 and 2012 MRIs, and CT scans and EEG testing from the 1990s. In his opinion, she was incapable of performing jobs that involve stress.

On December 5, 2017, or approximately twenty-one months after Baldridge was last insured, Taylor signed a letter addressed to Baldridge. In the letter, he represented the following:

> ... I am writing this letter to further document the debilitating nature of your migraine headaches. As you know, for many years you have had migraine headaches that are mainly triggered by dust, fumes, odors (i.e., Cleaners, perfumes/colognes, gasses), bright/flashing/flickering lights, sun glare, noise, emotional stress and extreme temperatures.
>
> When these headaches develop, a severe, throbbing, pulsating pain develops that can last for 4 to 72 hours (12 hours on average). They start with neck pain, aura that leads to nausea and vomiting and associated dizziness, light sensitivity, poor concentration, fatigue, and depression.
>
> Since you first consulted with me in April of 2012, no therapy has been successful in significantly improving your symptoms. As you know, this condition when coupled with several other co morbidities from which you suffer, including fibromyalgia, chronic vision problems, anxiety, extreme fatigue, and evidence of autoimmune disorder have made it impossible for you to maintain employment.

See Transcript at 893.[4]

---

[4]     The record contains additional medical evidence from 2017 and on into 2018 and 2019, all of which is well past March 31, 2016, i.e., the date Baldridge was last insured. See Transcript at 1284-1294, 1272-1281, 1295-1303. In Brown v. Colvin, 992 F.Supp.2d 947, 955 (D.Neb.), aff'd, 581 F.App'x 598 (8th Cir. 2014), a district court observed the following with respect to medical evidence from outside the insured period:

> Records and medical opinions from outside the insured period can only be used in "helping to elucidate a medical condition during the time for which benefits might be reviewed." Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). "The ALJ need not consider medical records created after

Baldridge completed a series of reports in connection with her application for disability insurance benefits. In a June 8, 2013, pain report, she reported that she has ten to twenty migraine headaches a month, headaches that last between one to three days. <u>See</u> Transcript at 515-516. In a June 8, 2013, function report, she reported that she can attend to her own personal care; prepare simple meals; perform house and yard work, including occasionally mowing her lawn with a riding lawnmower; and shop for groceries. <u>See</u> Transcript at 517-524.

In the ALJ's third decision, he found at step three of the sequential evaluation process that "[t]here is no medical listing corresponding to chronic migraines," and none of Baldridge's impairments met or medically equaled a listed impairment. <u>See</u> Transcript at 13. The ALJ assessed Baldridge's residual functional capacity and found that through the date she was last insured, she was capable of performing less than a full range of light, unskilled work. The assessment included the finding that she should avoid "excessive exposure to dust, smoke, fumes, or other

---

the date last insured unless they relate to [claimant's] condition before the date last insured." <u>Bannister v. Astrue</u>, 730 F.Supp.2d 946 (S.D.Iowa 2010).

The Court has considered the medical evidence from outside the insured period. The evidence reflects that Baldridge continued to complain of frequent migraine headaches well past the date she was last insured.

pulmonary irritants ..." See Transcript at 14. In making the assessment, the ALJ gave little weight to Taylor's medical opinions. The ALJ found at step four that Baldridge was capable of performing her past relevant work and thus was not under a disability through the date she was last insured.

Baldridge sought judicial review of the ALJ's third decision by filing a complaint in 1:18-cv-00063. In it, Baldridge maintained, in part, that the ALJ erred in weighing Taylor's medical opinions. The Court reviewed the record and could not determine how Taylor's opinions could be weighed as they were. The Court therefore ordered a remand so that Taylor's opinions could be re-evaluated and Baldridge's residual functional capacity re-assessed. In a footnote, the ALJ was directed to evaluate Baldridge's migraine headaches pursuant to Listing 11.02, which the Court accepted was the most closely analogous listing for migraine headaches.

The ALJ conducted an evidentiary hearing following the remand in 1:18-cv-00063, a hearing during which Baldridge testified. See Transcript at 928-951. She was fifty-four years old in March of 2016, the month she was last insured. She has migraine headaches fifteen to twenty times a month. The pain is severe and involves "pounding, pulsating, and nausea." See Transcript at 935. If she can get to a dark room, lie down, and be still, she will not throw up. Baldridge takes Zomig for her headaches, which has

proven to be ineffective. On average, her headaches last between six to twelve hours but can last as long as three days. Her headaches are brought on by dust, fumes, and strong odors. She was capable of mowing her own yard through 2013 but has stopped doing so.

In a March 3, 2020, decision, the ALJ found at step two that through the date Baldridge was last insured, Baldridge's severe impairments included migraine headaches. He found at step three that her headaches did not meet or equal a listed impairment. He assessed her residual functional capacity and found that she was capable of performing a reduced range of light work but would have to avoid, <u>inter alia</u>, concentrated exposure to irritants, poorly ventilated areas, and excessive vibration. In so finding, the ALJ noted that the treatment for Baldridge's headaches was routine and conservative. The ALJ also gave no weight to Taylor's medical opinions found in the following documents:

(1) Taylor's May 6, 2015, To Whom It May Concern letter, <u>see</u> Exhibit 20F, Transcript at 844;

(2) his May 6, 2016, To Whom It May Concern letter, <u>see</u> Exhibit 22F, Transcript at 846;

(3) his March 2, 2017, residual functional capacity form, <u>see</u> Exhibit 23F, Transcript at 847-852;

(4) his May 18, 2017, headache questionnaire, <u>see</u> Exhibit

29F, Transcript at 891-892; and

(5) his December 5, 2017, letter to Baldridge, <u>see</u> Exhibit

30F, Transcript at 893.

The ALJ gave the following reasons for affording Taylor's medical opinions

no weight:

> The [ALJ] considered treating source statements from Tommy
> Taylor, M.D. (Ex. 20F, 22F, 23F; 29F; 30F). However, these
> statements are afforded no weight because the opinions are not
> given in functional terms, relies upon the claimant's subjective
> complaints/reports, touch upon an issue reserved [for the]
> [C]ommissioner, and are not consistent with Dr. Taylor's own
> findings as well as with other medical findings. In part, Dr.
> Taylor indicates that the claimant is limited to lift/[c]arry less
> than 5 pounds, has debilitating headaches in part triggered by
> odors, dust, sun glare, and emotion stress, and associated with
> extreme fatigue, nausea, and vomiting and occur as much as
> five days per week, lasting 1-3 days with no improvement with
> medications. However, on exam, in general appearance, she
> was always described as in no acute distress ... Additionally, as
> noted throughout this decision, physical exams were generally
> normal, without any evidence of focal deficits. There is no
> documented evidence on exams that the claimant is limited to
> lift/carry, as noted, she has normal strength, gait, and balance.
> Additionally, his opinions found at Exhibits 22F, 23F, 29F, and
> 30F were all rendered after the date last insured. Dr. Taylor is
> also not a specialist such as a rheumatologist or neurologist,
> but a primary care physician so his opinions carry far less
> persuasive. Dr. Taylor did not review the entire medical record.
> His opinions offered no explanation between the limitations he
> gave and the benign objective testing ... Additionally, Dr.
> Taylor[']s statements at least partially attribute the claimant's

headaches to dust, fumes, and odors, yet he seems to ignore the fact that the claimant mows her own yard. He also notes [the] claimant suffers with double and blurry vision, but again, a specialist found the claimant has no major issues with her eyes which would result in such a condition ...

See Transcript at 906-907. The ALJ found at step four that Baldridge was unable to have performed her past relevant work. He found at step five, though, that there was other work she could have performed and, thus, was not disabled at any time between April 1, 2012, and March 31, 2016.

Baldridge challenges the ALJ's March 3, 2020, decision on two grounds.

*Claim One:  ALJ Failure to Properly Evaluate Listing 11.02:*

She first maintains that he committed legal error when he failed to comply with the remand order in 1:18-cv-00063. It is her contention that her migraine headaches were not adequately evaluated pursuant to Listing 11.02, noting that the ALJ simply provided a "non-detailed and superficial analysis" at step three. See Docket Entry 14 at CM/ECF 23.

At step three, the ALJ must determine if a claimant's impairment meets or equals a listed impairment. See Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination is strictly a medical one, see Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990), and the claimant bears the burden

of showing that her impairment meets or equals the listing, see Pyland v. Apfel, 149 F.3d 873 (8th Cir. 1998). "The severity standards for listing-level impairments are high, because 'the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.'" See Wright v. Saul, No. 4:19-cv-4051-SOH, 2020 WL 5819539, 2 (W.D.Ark. 2020) (quoting Sullivan v. Zebley, 493 U.S. 521, 532 (1990)).

"There is no listing that pertains specifically to migraine headaches," see Wright v. Saul, 2020 WL 5819539, 2, n.2, so a claimant alleging such headaches must show equivalency. To show that an impairment equals a listed impairment, the claimant must present "'medical findings equal in severity to all the criteria for the one most similar listed impairment.'" See Id. at 2 (quoting Carson v. Astrue, 604 F.3d 589, 594 (8th Cir. 2010)). To satisfy the 11.02 Listing, a claimant must point to medical, not testimonial, evidence of the occurrence and frequency of events equivalent to seizures.

The ALJ did not provide a detailed, comprehensive written analysis of Baldridge's migraine headaches at step three. He simply found that through the date Baldridge was last insured, her headaches did not meet the criteria of an 11.00 listing.  The ALJ did explicitly determine that "no treating or examining physician has mentioned findings equivalent in

severity to the criteria of any listed physical impairment." (Tr. 901). The Court is not persuaded that the ALJ failed to comply with the remand order in 1:18-cv-00063, and thereby committed legal error, as the record supports his overall conclusion at step three. See Karlix v. Barnhart, 457 F.3d 742 (8th Cir. 2006) (fact that ALJ did not elaborate on his conclusion at step three does not require reversal if record supports overall conclusion).

Medical entries from the relevant period supporting the ALJ's decision regarding Listing 11.02 include the unremarkable results of an April 10, 2012 MRI scan of Baldridge's brain (taken nine days after the alleged onset date) (Tr. 724), and unremarkable examination results from Waldrip (Tr. 715-717, 712-713, 709, 875-877), Majewski (Tr. 784-794), Sanford (Tr. 802-804), Kovaleski (Tr. 818-821), and Taylor (Tr. 733-735, 729-730, 726-728, 826-827, 829-831, 859-860, 860-862, 862-863). Also, Taylor's May 6, 2015, To Whom It May Concern letter offered no medical findings to support his conclusion that Taylor suffers from debilitating migraine headaches. (Tr. 844). Additionally, Mann's July 18, 2013, consultative physical examination was supported by no medical findings. (Tr. 767-772).

The ALJ did not err in finding that Baldridge did not meet Listing 11.02.

*Claim Two:  ALJ Error in Assessing Baldridge's RFC:*

Baldridge faults the ALJ's RFC determination generally, and also faults the assessment in two specific instances:  one, the limitation to concentrated exposure to irritants and vibrations is inadequate; and two, the ALJ improperly assessed Taylor's statements.

It "is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). There is no debating that Baldridge sought treatment for vision problems and reported migraine headaches during the relevant period.  Frequency of treatment and subjective statements, however, do not answer the primary question of whether the impairments are disabling.   The ALJ thoroughly discussed the medical treatment given Baldridge during the relevant period.   His observations include the largely normal physical examinations by several physicians, her history of employment despite the history of migraines, the routine nature of medical treatment, and her daily activities (including her ability to drive). (Tr. 904-906).   The ALJ

adequately examined the medical records in assessing whether Baldridge proved that her impairments were disabling.  The ALJ's task is to sort through the medical records and other relevant evidence.  He is not required to adopt the view of any particular medical provider, nor is he bound to find disability based upon subjective assertions or frequency of treatment.  In this instance, the RFC acknowledged Baldridge's impairments by restricting her to less than the full range of light work. This included allowances for her sensitivity to irritants and excessive vibration.  Substantial evidence supports the ALJ's weighing of the evidence and the resulting RFC decision.

Baldridge contends that the RFC's restriction to avoid concentrated exposure to irritants and excessive vibration was too lenient because even incidental exposure to irritants and excessive vibration would trigger her migraine headaches.  In support of this claim, Baldridge relies on physicians' findings that her migraine complaints were credible and to Taylor's multiple opinions.  These arguments do not prevail.  While the ALJ found migraines were a severe impairment, the presence of migraines does not demonstrate that even incidental exposure to irritants and vibrations trigger the headaches.  In addition, Taylor's opinions were largely provided

after the relevant period.  Baldridge does not establish that the RFC was erroneous regarding exposure to irrritants and vibrations.

Baldridge also faults the ALJ's treatment of Taylor's opinions.  The ALJ's analysis, previously quoted herein, was appropriate.  The timing of Taylor's opinions, occurring after the relevant period, is significant.  The ALJ also noted other valid concerns, such as Taylor's status as a general practitioner, not a specialist, inconsistency between Taylor's opinions and his own treatment notes, and inconsistency between his opinion on Baldridge's vision and the opinion of a neuro-ophthalmologist.  Substantial evidence supports the ALJ's consideration of Taylor's numerous opinions.

The Court is mindful that its task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion.  The test is whether substantial evidence supports the ALJ's decision.  See, e.g., Byes v. Astrue, 687 F.3d 913, 915 (8th Cir. 2012).  This test is satisfied in this case, both with regard to the Listing and the RFC determination.

IT IS THEREFORE ORDERED that the final decision of Kijakazi is affirmed and Baldridge's complaint is dismissed with prejudice.

IT IS SO ORDERED this 14th day of December, 2021.

_____
UNITED STATES MAGISTRATE JUDGE